Good morning. Before we begin, I would just like to point out that these microphones for the attorneys do not amplify. They only record. So the people in the back of the room want to hear what you're saying. We want to hear what you're saying, so please speak up. Also, our apologies to the members of the press who are here. You know you're not allowed by Supreme Court rule to bring cameras and recorders. You use them in the courtroom, and so for those of you who had them and had to leave them outside the door, we believe that they'll be safe out there. We know that you've done this before, and of course you're welcome to take any notes that you want. Further, I'd just like to point out for anybody who's not familiar with our process, this proceeding is being recorded and the audio will be available sometime today on the official site of the Illinois Supreme Court, www.state.il.us.court. If that, the clerk will call the case, please. Counsel, if you could both approach and identify yourselves, introduce yourselves. Darrell Roman for the appellant, William Balfour. Peter Fisher, an assistant state attorney on behalf of the people. Thank you very much, gentlemen. Morning, your honors. May it please the court, I'm Darrell Roman, and I represent the appellant, William Balfour. William did not kill Julian King. We know this based on the physical evidence and the testimony of the assistant medical examiner who performed an autopsy on October 28th. She testified to her expert opinion that Julian had been killed 36 to 72 hours earlier. 72 hours, of course, is three days. October 28th, three days earlier than that, is October 25th, and this is significant because William was in custody on October 24th. And again, it's significant because the state charged in this case that William Balfour personally shot and killed all three victims. He was not charged under an accountability theory. It's not sufficient for the state to prove that he was somehow involved or implicated in the offense. They had to prove that he was the shooter. And instead they proved that he was not the shooter. Their own witness, the medical examiner, testified that it was impossible that Julian King was shot and killed after Mr. Balfour already was in custody. Why is that dispositive? Well, this court has to look at the physical evidence here. But why is that particular fact dispositive of that issue? Well, with respect to – I do have a separate sub-argument in my brief with respect to Julian King in particular. And he was charged with shooting and killing Julian King. So if the state's evidence proves that he was in custody, I can hardly think of a better alibi than I'm in custody at the area in handcuffs when the victim was killed. So I would say it is, in fact, dispositive that it's physically impossible for Mr. Balfour to have killed Julian King. Can a witness like a medical examiner be wrong about an opinion but still be – does that mean that you can't even consider it just because she states an opinion that may prove to be wrong? I would suggest you should consider the medical examiner's opinion. I don't want you to discount that at all. No, it's the state's witness. We agree with that. The jury considered it. Yes, that's right. You certainly argued it, right? Yes. Do you know what time of day the autopsy was performed? It was in the morning. An autopsy is a process of several hours. I believe it was something like 8 o'clock in the morning. 8 o'clock in the morning? Not at 1 o'clock in the morning. 8 o'clock in the morning. Right. The body was recovered at 7.30 in the morning on October 27th. But there was a lot of processing involved. All of the evidence technicians actually. The body was discovered inside of an SUV. The SUV was loaded onto a flatbed truck driven to a police auto pound. And for obvious reasons, the techs wanted to process the entire SUV with the body and all of the evidence inside of the SUV before it was eventually taken to the morgue for the autopsy to be performed the following morning, that being October 28th. In addition, there's no other evidence that he killed Julian King. He never said that he killed Julian King. There was DNA found on the murder weapon that was never identified. The DNA experts in this case produced a male DNA, found it on the murder weapon. It was never matched to anyone. Now, there's a lot of DNA on the weapon inside the SUV. They're very thorough in this case in terms of processing the physical evidence. And there was DNA of the other victims, DNA of the friends of the victims, but not William Belfort's. There's no DNA at all that connects Belfort to the murder. That's right here. And, again, that's significant because they were extremely thorough in this case. They processed the SUV twice, initially in 2008, but then they went back in 2011, ripped it all apart, processed it again. Had there been any evidence connecting Belfort to the murders, I would say I wouldn't be in a position to make this argument, but this information's been loaded into the CODIS database. It didn't hit with the DNA experts' testimony. That doesn't mean it's not going to hit at some time in the future. They also found boot prints on the back seat, and this is significant because Julian King was shot in the back seat of the SUV at a downward angle. So, again, reasonably, they processed that boot print. They had their expert testify. They tried to match it to Mr. Belfort's boot, and it didn't match. Again, I think it's significant. He made no statements indicating that he killed Julian. So we should take that into account, but don't believe the statements that he did make where he said he killed the other two? Well, I won't get to that in a moment, but certainly with respect to the situation, It seems a little inconsistent to me. You're asking us to be inconsistent. I would ask you not to consider that at all in light of the circumstances under which the statement was made, but certainly if you're inclined to consider it in light of this specific issue of whether the state proved beyond a reasonable doubt that he personally shot and killed Julian King, I think you have to answer that he did not. Well, when he was saying to his girlfriend, Kathy, that he killed the brother and the mom, then he said Julian was outside. He never said his girlfriend's testimony was not that he said that he killed Julian. That's correct. And you have to wonder what his girlfriend's testimony was all about, too. Right, exactly. And certainly in the context of this narrow issue, did they prove that he shot and killed Julian King, this court has to say no. It simply is not there, and you have to reverse outright on that specific count. One other point about that, again, the SUV was discovered on October 25th. Lynette Williams, the woman who found the SUV, pursuant to the Amber Alert, found it at 9 a.m. on October 25th. She didn't report it until the 27th, so that's when all the evidence was processed. But she testified that she went out to see a movie on the evening of the 24th. She didn't see the SUV at that time. She didn't see it until the 25th. Again, this is significant because Mr. Belfort was in custody on the 24th. So if the car was parked in front of her house on the morning of the 25th and it wasn't there on the 24th, he's not the one who put it there. He's not the one who shot Julian King. The state's brief has no substantive response to my argument here, particularly with respect to the medical examiner's testimony. They just say it's consistent. I'm no math major. If I was really good at math, I probably wouldn't have went to law school. But at least I know 72 hours is three days. October 28th minus three days is the 25th, and that's the day after William Belfort was in custody. Moving on to the other two victims, in light of the fact that somebody else killed Julian King, this court should not hold that the state proved beyond a reasonable doubt that he killed the other two victims. Somebody else is implicated in this case. And, again, the state charged him specifically that he shot and killed all three victims. They didn't have to do that. They could have charged him under an accountability theory. It's not necessary under precedent to identify who the other people are. If they didn't know who they were, they could have hedged their bets and said, one for whom he's responsible shot and killed. But they didn't do that. That was their choice in this case. They dropped hints of a larger conspiracy, but it didn't come up in the terms of the evidence of the case. There was no evidence that somebody else specifically was involved. They raised it for the first time in rebuttal submission in a circumstance where the defense was really in no position to contradict what they were saying. And they make a reference now in the appellate brief that somebody else was involved. You know, there's two cars in this case. I thought the reference was in the first argument by the prosecutor, because when Ms. Thompson got up, the first thing she said is, oh, now they've got an accomplice. There's a mystery person. So I think they've mentioned it before. You know, Your Honor is correct. I'll acknowledge I made a mistake there. It came up for the first time during the rebuttal, sorry, summation. Right. After all the evidence was in. And, of course, it comes up again during rebuttal submission. It comes up again in the briefs in this case. There's not really any evidence to support that. But if you're going to take that at face value and say somebody else was involved, I mean, I think it's pretty clear that even if you assume that Mr. Balfour is involved in some way, somebody else must have been involved. He certainly was trying to get some help. He was trying to get some help. I think the record's really clear that he was trying to get help to fix the power steering on his car. There's lots of evidence from a number of different witnesses. Or to get the car moved away from the south side to the west side. The evidence is that he moved around. Quincy Brown. The car meaning the green Chrysler or the white SUV? The green Chrysler. The green Chrysler was never moved to the west side. There's no evidence that he wanted to move it to the west side. That's not what I'm saying. What I'm saying is that during the afternoon when he was talking to, and I think it's Brown, but I could be mistaken. No, you're right. He was asking for help getting his car over to the west side. Your Honor's misremembering. That's not Mr. Brown's testimony. Mr. Brown testified among a number of witnesses that Balfour had contacted him in an attempt to meet him in Englewood to help him fix his power steering. And, again, this is bolstered significantly through the record as a whole. Because this starts the day before when Mr. Balfour gets a call from a gentleman named Duke, whose car broke down on the southeast side. He drives out as a Samaritan, helps Duke. He wants Duke's help in the morning. I'm talking about Brown in the afternoon. And the record indicated that when he talked to Brown in a couple conversations, one while he was put on hold and his wife then is talking to him, saying that he was involved in the murders, he's asking Brown for help to bring his car out to the west side. That's in the record. Respectfully, Your Honor, that's not my reading of the record. I went back and reread Mr. Brown's testimony last night. He testified that Mr. Balfour was calling him, saying, meet me at 71st and Vincennes. To be clear, that's not the west side. That's the south side of Chicago. That's not very far from where his car was parked on 68th Street in front of Robeson High School. It's only about three blocks south and a few other blocks east or west. And, again, relating back to the previous day, he had gone to the southeast side to help Duke with his car. In the process, his car had broken down. Julie had contacted him the night before, said, don't go in tonight. I want to see you. Come to my house. It's my birthday. I'm not with Richard. I'm just with my girlfriends. I'm with Julie, and I want to see you tonight. And he couldn't make it because his car broke down. But he got out there at 730 in the morning. And, again, we have a witness, One of the state's first witnesses testified that he met Mr. Balfour in Englewood at 730 in the morning, and that the very first thing he said was, can you help me fix my car? The power steering is out on my car. And the gentleman was with another friend. He couldn't help him at that time. This is right before he met Julie at about 8 o'clock on the same day. 10 o'clock, there's evidence he went to Duke's house, and Duke's house was in my favor at this point. I helped you out the day before, and you helped me out now. And there's another witness who was present who testified to that conversation that he said, can you help me with my car? My car's broken down. The witness also testified that he drove his green Chrysler there. I mean, he was moving it himself. The first witness testified he drove it to Englewood at 730 in the morning. The next witness testified he drove it to Duke's apartment at 10 o'clock in the morning, and then he drove away in his green Chrysler. And we have surveillance video showing the green Chrysler being parked at 1230 by Roach in high school. We don't know who was in the car. I mean, that's true. It's not a high enough quality picture to see who was driving, but we do see the car being parked. So it establishes the timeline of when the car was parked there. But it also establishes, with respect to Justice Lavin's point, that the car can move. It has power steering issues. You can move it, but, you know, this is a mid-sized Chrysler. You know, it's not a giant behemoth from, like, the 1970s or something, but Mr. Belfer's not a big guy. He's maybe my size or smaller. It would be a hassle to drive a car with power steering issues, so he wanted to get it fixed, desperately. And there's multiple witnesses who testified that he had this problem. We also have one of the two Citgo surveillance videos shows that immediately after Julia went to work, William went back to Citgo and bought a bottle of steering fluid. Why? Because people are telling him, you know, try this, try that. He can't fix it by himself, but he's trying to fix it. Well, there's a bottle of power steering fluid in Jason's car, too, backseat of his car. There's a number of things. Jason's car. A lot of car problems in this case. Yes, Jason's car. Well, they're both 1994 model cars, and this occurred in 2008. So, with that 14-year-old car. So, yeah, probably a lot of car problems in this case. You know, this is Englewood. We're not all driving around in late model Cadillacs or anything like that. So, moving on to my next point. There was a great deal of physical evidence in this case, including numerous scores of items in the SUV, all of which were swabbed for DNA, tested for fingerprints. In many cases, they found DNA, and they found fingerprints, and some of them matched up to people you would expect to find in the car. Jason and Jason's car, his sister, his friends. But they weren't all identified, we have. Unidentified male DNA, we have unidentified fingerprints. There were five fingerprints on a Pepsi bottle, suitable for comparison. Dropped into a database. They didn't match anybody in the case. They didn't match anybody in the database. There were a number of fingerprints lifted from papers that were found in the SUV. Eleven of them were suitable for comparison, but never matched to anyone. So, we do have a great deal of physical evidence. As Justice Hyman pointed out, none of it implicates Mr. Balfour, which is remarkable considering just the sheer volume of it. Had he done what the state said that he did, that he was in the SUV, he's in the green Chrysler, he's in the Hudson Elm, he's got the murder weapon, you would think his DNA and his fingerprints would somehow be on something at some point. The state suggested at trial that he wiped it off. Well, then why is the other DNA there? Why are the other fingerprints there? You can't take a glass of water and wipe off your own fingerprints, but not wipe off all the fingerprints of the people who had touched it before you touched it. It's just simply not a reasonable theory of the case. The theory of motive also makes no sense. The timing of this is really suspicious. I mean, they put out a lot of evidence that there's kind of an open marriage relationship here. They remained married. They were seeing each other. They were seeing other people, and there was jealousy. There was jealousy on both sides. That's for sure. They did put that in evidence. He was jealous of Richard. She was jealous of his girlfriends. It was a back-and-forth mutual thing. But the timing of this is very interesting because she had just called him the night before and said, I'm up. It's my birthday. I'm not with Richard. I'm with my girlfriends. I'm with my son. I want to see you tonight. She's inviting him over to the house. He was celebrating somebody else's birthday at that time, right? Yes, Kathy's daughter's birthday was also, I believe, the 23rd, which is the day before. Complicated social situation. Extremely complicated. All over the city. That's true. West side, southeast side, Inglewood, back and forth. He's constantly trying to make plans, changing plans, getting better offers. As Ms. Thompson pointed out, he's a dog. There's no question. Right? He's playing the field. But that's not a motive to murder three people in cold blood, particularly with respect to the timing of the case. She just invited him over. You know, they argued with the jury that he's stalking her, that she didn't want him there, she was just trying to get rid of him. That's completely undermined by her testimony, Julia's testimony. She testified very frankly and truthfully as to what happened that day, what happened the previous day, and the text messages themselves. She's texting him. He's texting her. She's calling him. They're making plans just a week before. They went to a motel together. So Richard's pretty much out of the picture at this point. They're still married. They're still in a relationship. It's complicated. It's unconventional. It's true. But, you know, I mean, everything's not in his favor. We don't need to get into the dynamics of why a woman might remain with a person like this, but he had several women that he was stringing along, right? That's true. He did. And he didn't even really have a home in any particular place where he hung his hat seven days a week. He'd go from place to place. He would be at Kathy's. He'd be at his mom's house. It's true. It's all very true. But none of that creates an incentive for him to kill three people and fill blood. It just simply doesn't make sense. And the state's basically warping the record to say she doesn't want him around. He's jealous. She's leaving him. Even the threats in this case are in the context of if you leave me, I'm going to kill your family. She didn't leave him. She didn't file for divorce until after this case was already underway. The state had filed charges, and the process of this case had begun. Then she filed for divorce. She met him only a week before. She called him the day before. He was there that morning because she invited her. He would have been there the previous night, but again, he had car troubles. He was with another woman. That's true. The actual motive in this case is Jason's drug dealing. The evidence in the record shows that he sold dime bags of crack out of the house, $12 a day, that he cooked pure cocaine that he bought with cash into crack inside of the house. There were stashes of drugs and stashes of money in the house, and when the police came to process the scene, it was all gone. The state makes a lot of the fact that Jennifer's checks were there, jerseys were there, large teeth. I think they mentioned a treadmill at one point. Yeah, great. Somebody breaks into a house, shoots two people at 930 in the morning. They're not loading up the truck with a treadmill. They're not taking things that are readily identifiable like a check. It says Jennifer Hudson in the upper corner. They're taking what they came there to get, the drugs and the money, and it's all gone. How do we know that there were drugs and money in the house at that time? What evidence was presented that it was there at that date? Yes, Your Honor. A number of Jason's associates testified because they're, ostensibly the state put them on because their DNA or fingerprints are found on the car or somewhere else to explain. I'm a friend. There's a reasonable explanation for why that was there. On cross-examination, the defense team routinely said, and he had drugs there, too, didn't he? Yes. He had money there, too. Yes. Every day. $12 a day. Cash business. Everything was done in cash. A number of his associates said he would pay for everything in cash. His jerseys and all these other things. These were not gifts from Jennifer. Jennifer gave him a 1994 Chevy Suburban. The jerseys, the TVs, the speakers, all these things were paid with his own money, and he was on disability. You're not buying all this stuff with a disability check. He's doing it as his own friends testified because he's selling drugs out of the house. Well, I recall an opening statement that there was, by defense counsel, going to be evidence that he wasn't just a dime bag seller of this drug. He was into weight, right? He's moving weight out of the house. Yes. And that's certainly what the defendant offered up in his statement with police. He was rather willing to talk to police to let them know, no, this ain't me. This is somebody going after Jason because he's moving weight. Yes. And he said that's why he moved out of the house, right? Yes. A drug dealer moved out of a drug dealer's house because it was a drug house? Well, they weren't together. They weren't dealing drugs together. They certainly weren't on the same level. Where's the evidence of weight is what I guess I'm talking about. Where's the evidence of vast sums of cash? Where are the kilos and eight balls that were spoke of in opening statement? I believe that opening statement was a reference to, as you pointed out, Williams' custodial statement where he says, if you watch that, he's moving weight out of the house. No, but where's the evidence of it? That's the evidence? No, no. I'm explaining to you that's the context of the opening statement. Now, it's splitting straws to say it wasn't weight. It was only dine bags for 12 hours a day every day. You're talking about splitting hairs. You represent somebody who was a drug dealer himself. Sold the same stuff. And he himself said, no, I'm not selling weight. No, no, I'm just selling dine bags. Is this the only evidence that was in the record that Jason was also doing the same thing? There's certainly no evidence in the record that William was selling weight. He worked full-time as a baker at Cozy over on Michigan Avenue. He was selling a small amount of drugs on the side. That's clear. Jason had no job at all. He was on a disability check. Lived what his friends described on the record as a fairly lavish lifestyle. He was spending money on his friends. He had basically an entourage of people. I don't know if the state called in maybe seven or eight people who all testified, I'm Jason's best friend. I saw him every day. I would do things for him. Again, he's overweight. He's disabled. He can't do things for himself. He's paying his people in drugs and money to do things for him. He's buying jerseys for himself. He's throwing these barbecues. So I would suggest there's ample evidence that there was a lot of cash flowing through the budget. I mean, we've seen the evidence in the photographs. This isn't, you know, an opulent residential situation we're dealing with here. You're right. Mattresses are on the floor. Very meager surroundings, right? That's true. Because, I mean, I would submit this is a nine-bedroom house in Inglewood. It's seen better days. But the reason he's still there is because, independent of Jennifer, he's a prominent individual in the community, he's a pretty high-volume drug dealer. You could say it's not kilos or eight balls. That's true. He's at the retail level. He's selling dime bags. But he's selling an awful lot of dime bags. He's selling them in two states. His brother Juan, his stepbrother Juan, he's driving in three to five days a week to help him sell drugs. It's worth his while to drive in all the way from Michigan just to help him sell drugs and go back out to Michigan. It's a fairly large operation. We also know that he has enemies. He's been shot twice before. He's had his house broken into, the one in Michigan and the one on Yale, the one at issue in this case, has been broken into twice before. This has nothing to do with William. This is in context of drug dealing. This has to do with either gang rivalries or drug territory or stealing drugs or stealing money. So I would submit there's a lot of evidence in this case that Jason had enemies. He had enemies because he was a drug dealer, because he had drugs, because he had money. And he was shot twice before. The evidence was he needed a handgun for protection. His father said to his half-brother Lonnie, hey, he's been shot. You need to get him a gun. And then subsequent to that, he got shot again five times. The reason he's disabled is because somebody broke into his house in Michigan and shot him five times in the leg. That's his disability. So clearly, having been shot twice before in cases that did not involve William at all, it's understandable, I believe, based on this record, that the motive in this case was Jason's drug dealing. Well, I guess it certainly was what the defense tried to do at trial. I mean, it was very, very well and vigorously defended that that's what happened here, that this all had something to do with Jason and nothing to do with William, who's just, you know, a victim of circumstances here, right? Yes, you're right. And I think the problem with the defense case is this is a jury trial. This is a horrible incident. We have the brother's dead, the mother's dead. More importantly, a seven-year-old is dead. Yeah, that's not the only problem with the defense case. The problem with the defense case is that when your client is in custody, freely giving a statement after having his rights read to him, he tried to give them, you know, if you want to talk about this being a rush to judgment, he's trying to help them rush to a different judgment, right? He's trying to get them to say, no, this ain't about me. They're protecting Jennifer's name, and they're going after me because of that. But in the process of doing that, he wasn't entirely honest or accurate with the police, was he? No, he lied about the time that he parked his car. He lied about his CTA pass, too, didn't he? He had a CTA pass that was recovered. They checked it out against the CTA database, and it wasn't used. It was an expired CTA pass. And he lied about the fact that he was at Kathy's apartment all afternoon, right? No. He didn't lie about that? Well, I mean, he was down there from 12 to 1, but from 1 until the time he was arrested at 6 or 5, he wasn't at Kathy's apartment. And we know that from the cell phone records. You've got to look at the physical evidence here. The state usefully put on an FBI agent to testify to historic cell site analysis. And the maps included in my brief, you can see there's a call. Well, we have, again, the ropes and surveillance video. The car's parked. Then shortly after that, the timeline, 1256, the cell phone data puts him at 20th and Western, which you can see from the maps is between Inglewood and Kathy's house. And then after that, this guy's a hard core. We all know people like this in our life. He's a hard core phone user. He's texting, he's calling, he's going back and forth. There's tons of data. Puts him at Kathy's house. He's not moving from location to location. 104, 143, 204, all the way up to the time he was arrested at 6 or 5 p.m. What troubles me is what happened with the conversation with Kathy, where she testifies that he said that the brother and the mother were shot. Sure. How is the jury not to accept that? Well, let's put that in context. So, again, 6 or 5, Williams arrested. Kathy's taken away as well. She's not a suspect in this case, but they want to question her. They take her. They treat her essentially the same as they treat him. They lock her in an interview room. She's left on a metal bench overnight. She tells him he's there at 10. No, we're not buying it. We have your phone records. It's not 10. She tells him 11. Okay, well, 11's pretty good. We could work with 11. Doesn't incriminate him at all. She spends overnight, no contact with anybody outside. She's got children in her apartment. She's taken out of the apartment. Her children are left there. She doesn't know where they are. Taken to the area, left there overnight. The next day, finally, she says the statement that your honor is referencing about Jason came at me, the mother came down the stairs. The next day, and then they immediately let her go, and she could find her children and live happily ever after, I guess. But also the statement's inconsistent, again, with the physical evidence of what actually happened. Jason didn't come at him. Jason was shot in his bed. The mother was shot just outside of his bedroom with a broom in her hand defending herself. Do you think maybe he might decide if he's going to tell her what happened, tell her in a way that's a little more palatable? You know, I mean, instead, I mean, the state proved that it was a grandmother shot in the back carrying a broom, a sleeping man killed, and a 70-year-old kid with two bullets in the back of the head in a car. Maybe he didn't want to give those kind of details. I would say if he's going to tell her anything, he's going to tell her what he told everybody else. This is bigger than me. She told Quincy Brown, I believe. Well, he said something else to Quincy Brown, and I'm glad that my colleague brought up the Cathy conversation, because he made an incriminating statement to Quincy Brown as well, didn't he? I'm not sure what you're referencing. I'm referring to the fact that when he got back on the phone, the time he got back on the phone with Brown, he said that he was, that was his wife on the other line, and in some substance, that he was being blamed. And Brown said, well, why would she blame you of all the people in the world? And he said, because I got into it with that bitch-ass nigger this afternoon. Yeah, and there's actually other evidence in the record that, I don't believe he said this afternoon, but there's plenty of evidence. I think you're right about that. There's plenty of evidence in the record that he did not get along with Jason and that earlier, maybe a week earlier, two weeks earlier, he had gotten into it with him to the point of almost a physical confrontation, but it didn't go that far. I'm certainly not contesting that, you know, he loved Jason Hutz and he got along with his in-laws. The record's clear that he didn't. But I still understand. Are you saying that Cathy just made this up? If he told her anything about that, nobody else knew at that time. Yes, I'm suggesting that she made it up. She totally made it up. This is after a night on a metal bench. She testified she had to pound on the door just to use the bathroom. She didn't know where her kids were. She's out there on her own record. Come on, counsel, come on. If they're going to sweat somebody, they're going to sweat the defendant. The defendant is in there talking to them. You know, they're getting information from the defendant. Once it's right, once it's wrong. But they don't have to sweat just one person. They can sweat as many people as they want. They clearly sweated her. She wasn't there on her own record. She was locked in a room with a metal bench. I mean, it's an interrogation room. She's not sitting at a desk. She had knowledge of at least two homicides. Of course she's being held. They don't know that. There's not, when they bring her in, there's no questions asked at all. This is another significant thing about this case. They find out about Cathy in seven other addresses from Julia. One of the addresses is Cathy. And then they use this quick data to narrow it down. We're going to go to Cathy's house. They get there at 515. Case it for 45 minutes. 605, they break in. Don't ask one question. Remember, Julia's on the phone with William. He calls her at the location. She has him on the phone. The officer with her says, just play it cool. Don't ask him any questions. And he says he'll be right over. Right. Right. And we see he gets a series of phone calls. And the phone calls after that are, the initial phone call, the reason he's calling her is he found out that shootings occurred. And one of the other witnesses testified, something's going on at the house. You need to call Julia. And he does. Shortly after that, within like five minutes, he calls Julia. Finds out what's happening. Then he gets a number of phone calls after that. Hey, you're all over the news. The police are looking for you. So this is why he didn't get angled with. This is why he said to Cathy, say I was here since 10 o'clock in the morning. But that's not incriminating either, because according to the state, the shootings occurred at 9, 930 in the morning. Why is he telling her I was there since 10? Because he doesn't know. He's not the shooter. He's not the one who went into the house and shot the two people at 9 o'clock in the morning. If he knew that, he'd say, say I was at your house at 7, say something else. Right? Anything but 10 o'clock. Where does 10 o'clock come from? Which goes back to Cathy. I mean, we know Cathy's lying. Right? She told the police 10. That's a lie. Well, we don't know if that's lying or a misunderstanding. With respect to the time frame, she gave three times over the course of this case. She kept changing it. I don't know. She kept changing it. That's what I meant. I don't know if that's lying or just misremembering or what you're saying that she was forced to keep changing her story. If we assume that William told her, say I was here at 10, she told the police he was there at 10. It's the state's position. I'm certainly going to agree that that was a lie. She's lying. She changes it to 11. She doesn't change it until 12 until trial years later. So, she's conveniently going to say whatever she needs to say to keep herself out of trouble. And certainly out of custody, right? She's locked in an interrogation room. They won't let her leave. They're not happy with her answers. They make that clear. That's in the record. She testified, frankly, at least on this point, that they wouldn't let her go. They'd come in, two detectives at a time. They'd say she was lying. They'd leave. Two other detectives would come in. This is all in the record. She spends the night on the bench. She's pounding on the door. That's all in the record. So, for sure, they're splitting Cathy. If somebody's a witness and they're not trying to sweat them, they're not in an interrogation room. They're not using teams of detectives. They're not holding them overnight. You know, according to the Chicago police orders, they can hold witnesses for 48 hours. They held her for about 48 hours. All right. In that light, why don't you edify us as to how this case is somehow similar to the rather celebrated case of Juan Rivera. It's similar in the respect that in Rivera, we have this sort of statement where we have Juan's lawyer, Cathy's lawyer. In Rivera, you had a confession. You had a guy who was in there with the police for hours and hours and hours and giving different versions until they finally gave the version that satisfied the police. We had a confession, and we also had two other statements to witnesses, incriminating statements were admitted at his trial. But significantly, we also had exculpatory DNA. There was DNA from an unidentified male subject, fingerprints, unidentified, never explained by the state. And again, they tried to explain it away. They came up with a theory that frankly didn't make any sense, that I believe the court said was highly improbable. It distorted to an absurd degree the real and undisputed testimony. I submit that's analogous to this case. We have unidentified DNA, male DNA. We have unidentified fingerprints, and we have this theory that distorts what happened. The state argued to the jury that when Julia went to work and Williams out front, as soon as she turned the corner, he walked right into the house, shot two people, took the seven-year-old outside, shot him in the driveway, all of which is completely undermined by the testimony, by the physical evidence. We know from the Sitco surveillance video, he didn't stay there. He went to Sitco. We know from the medical examiner's testimony, Sitco is like two blocks away. That's true, but he didn't, as they say, walk right in the door. We know he certainly didn't shoot Julian King in the front yard on the 24th, because we know from the medical examiner's testimony, he died on the 25th or the 26th. Also, it makes no sense. You're not going to fire two gunshots that are heard by the neighbors, take a third victim outside, shoot him in the front yard, and run dead. It makes no sense at all. You'd shoot him in the house. Let's talk about, in Rivera, there was a great legal word, aliand, A-L-I-U-N-D-E. What the court said in that case, that there is no evidence aliand apart from, aside from the confession that tied Rivera to the crime, and in fact, it was a rape case and a murder case, and they found the DNA and the deceased's body parts, that was somebody else's, not his. In that case, they said there was no evidence aliand. Are you saying that the same is true here? In Rivera, there were, as I mentioned earlier, the two other statements. I think the court ended up discounting them and characterizing them as jailhouse snitches and saying these people are trying to get something for themselves, and they're telling the police what they want to get. Their holding was that there was no evidence aliand in that case. You're right. They discounted it. So I'm asking you, is the position of the defense here that it's the same situation? If there's no evidence here aliand apart from the confession, the statements that this defendant made that would tie him to the crime? Other than analogous testimony, analogous evidence. You mentioned the DNA evidence. Some of the DNA evidence in this case was on the murder weapon. It reasonably would lead one to believe that there's a reason that's on there. It could have been the person who actually shot the people, but that, of course, is not on there. It's not on there at all. So how did he get his own DNA off there and left another person's unidentified male DNA on there? Suitable for comparison. We have a sufficient loci match. If we knew who this was, we could match it up. But we don't have it. That's analogous to the physical evidence in Rivera. Again, it's not a rape case, but it's on the murder weapon. That's the connection I'm trying to draw. Are you done with that? Go ahead. I want to go back to Kathy. To me, her testimony is the key. Everything else, you can raise all these questions, but here is somebody who he admitted to at least two of the murders. So that had to have a tremendous impact on the jury. So she lies at the trial, absolutely continues this lie, even though what happened to her and she's setting up this guy who was her former boyfriend. I mean, you weren't able at the trial to get her off her story. She has new lies at trial. The 12 o'clock comes up for the first time at trial. He went in the house and got some booze. He had a bottle of liquor. That's a note of her previous statement. That doesn't mean she's not telling the truth, what he said at the time of the day of the murder. I would say the whole thing is awfully convenient and analogous to Rivera, and analogous in one other respect, or perhaps weaker in one other respect. As Justice Laffin pointed out, Rivera gave a custodial statement. Balfour did not implicate himself. There's inconsistencies in the story, but he didn't say to the police, I did it, I killed three people. Now, we know from our experience in Illinois, and the legislature passed a statute that said in homicide cases, you have to report these things, and it's in fact reported. The statement of Caffey is not reported. In Rivera, we have a custodial statement. That's in many ways stronger evidence than what essentially amounts to the equivalent of jailhouse snitch testimony. She's in custody. She tells them what they want to hear, and years later she's reluctant to change it. She repeats it at trial. She didn't have to. She knows that if she's making this up, she's putting this guy away. Yes. I mean, it all boils down to her testimony. But if she recants, she might be putting herself away. We have testimony from another witness, Elvin Ackoff, who did not have anything incriminating to say at all, but he testified that he was threatened with perjury if he went on to change his story and said something different than what he told them. The rest of the judgment is by the police, and they set this guy up, basically, by the way they investigated the case. I think he was clearly the initial suspect. He was the only suspect. Had any of his DNA hit somebody suspicious? They were very thorough from 2008 to 2011. They're putting it on him because they have nobody else, and it brings me back to a point I made earlier, which is a problem with the defense. You have this horrible crime. You have this one suspect. And you don't have anybody else. Not a situation where the defense team could say, he didn't do it. That's the guy who did it. Blame him. It's generally a growth of evidence that everybody cleaned up. They sweated people, and people other than Kathy didn't talk. Right? Somebody knows what happened in this case. Somebody knows what's going on here. This is gang culture, drug culture, and they're not talking. Well, there were people who were talking, and according to the defense, they were lying, like the neighbor of Kathy's, Graham. He made it up. The police officer put the keys in the inventory of the keys. He's framing the defendant. So, I mean, there's other evidence out there. You don't want to believe the witnesses, and you didn't want to persuade the jury that they were lying, that Mr. Graham, he doesn't know what he's talking about. He didn't see the defendant parking that car, walking down the block with a bottle of liquor in his hand. No, he didn't see that. He's making it up to help the police frame the defendant. And, again, I think that harkens back to the Rivera case where you have physical evidence and you have testimony, and people make mistakes all the time, no doubt, but the physical evidence tells the truth. And if you have a witness takes the stand and says, the sun rises in the west, this court, in light of precedents, Supreme Court precedents that people have teased in other cases, have to look at that with a jaundiced eye and say, we have to look at the physical evidence. We have to use common sense. We have to say, is this believable? We have a videotape of the Green Chrysler being parked at 1230. Graham's clear as day. He had just turned on the 12 o'clock news. It was certainly 12 o'clock. Oh, I saw him looking down from my second-floor apartment through the roof of the SUV. He had a powder blue hoodie. Nobody could see the powder blue hoodie. He'd never even talked to the guy before, but somehow he could positively identify him. And also, as you can imagine, there's no physical evidence that William did this crime. That's remarkable. You're right, Your Honor. Here we have this tremendous investigation going on months. And not one piece of evidence can match him up. Well, there was evidence that he was in possession of a gun as recently as a couple days before the murders. Yeah, a number of people said that they saw him with a .45 automatic. I guess it comes down to the real issue that you're talking about here and sufficiency of evidence. All of this evidence was in there for the jury to consider. There was nothing that the defense wanted to explore in greater detail than it was deprived of by any ruling of the court. So that as a court of review, we have to look at that in the light that's most favorable to the state. And we have to say, in order to overturn the verdict, that it's so unsatisfactory or improbable as to instill reasonable doubt. That's the standard we're dealing with. Tell us how we get there. The reasonable doubt standard is very difficult. That's true. But it's not. This court, based on the cases I cite, can't act as a rubber stamp. You should discount ridiculous theories that distort the evidence. There was an 11-day trial. I can't even tell you. They put on something like 84, 85 witnesses. Judge Burns characterized that as days and days of negative evidence because, as Justice Simons pointed out, there's so much evidence about this investigation that doesn't tie well into the case. So, I mean, if anything, it would serve to confuse the jury. They were out for three days. On the third day, there was most of it. Sorry? He had three votes for a while? Still, he had three votes on the third day. Yeah. And they're sending notes constantly going back and forth. I would say, you know, at the very least, you have to reverse a jury case. The evidence just simply isn't there. But, you know, even if you don't think, again, I would suggest in light of the precedents, you have to take a look at this case. You can't just rubber stamp it. You do have to take a close look at the evidence, but at the very least, the evidence is very close. That's why they were out. That's why it was 9-3 on the third day. And that creates a budgeted situation with respect to the other four issues. It was a well-defended case. The police did not have a perfect case. There was evidence that, you know, you would think would be there that wasn't there. But everything was considered, and how are we to say that the state's theory is so improbable that this guy's just a victim of circumstance? Because the theory itself is undermined by its own evidence. So the theory that he shot Julian in the driveway in the morning of the 24th, we know that didn't happen. That's the theory. That's the argument. The evidence isn't there to support it. Because there wasn't a bullet or shell casing or... And because he didn't die until the 25th or the 26th after William was already... We know that didn't happen. And because it doesn't make any sense. They're making an argument that it's not supported by the evidence, it doesn't make any sense. In light of the precedents I cited... Not filled by their own evidence. By their own evidence, right? It's this court's obligation to reverse under those circumstances. Now, there were tiny minute particles of gunshot residue on the steering wheel cover of the green car and on the headliner of the SUV. That's right. But gunshot residue doesn't necessarily... Just tells you there was a gun fired by someone who handled this stuff. But it doesn't tell you what gun. That's a correct statement. Right. So Jason had a gun. So having gunshot residue evidence in his own car wouldn't necessarily be surprising or compelling. I would make a slightly different point about it. I agree it's not incriminating, but for a different reason. Julian was shot inside the car. So it makes sense that there's gunshot residue inside the car. But as your Honor points out, it doesn't say what gun was used, who fired the gun or anything like that. The thing that bothered me was there was a little gunshot residue on the car if Julian was shot in the car. And we believe that that's probably true because of the bullet path. The other thing that bothered me was the defendant had access to this gun. We don't know whether he ever shot it or not. We don't know how the gunshot residue from any gun, this gun or any other gun, got on his steering wheel cover. We do know. Justice Lavin and I previously discussed Quincy Brown. And Quincy Brown testified. He was a mutual friend. All these people hung out on the same block. He had borrowed the green Chrysler on a previous occasion and was out firing a gun and then drove the car back. And the state's GSR expert testified that that's the sort of thing that could cause GSR to transfer if you fire a gun and then touch something else. And that tested the defendant for gunshot residue because it was too late after the alleged crime, the time of the crime. They felt that seven and a half hours was too long. They didn't swat his hands, but they had a lot of his clothing, including the clothing that, according to the state's theory, again, the state's theory is that Julian left, he's wearing a tan leather jacket, walks in and shoots three people. They had a jacket. So while you could wash GSR off your hands, it would still be within the fiber of the jacket. They tested it. There's no GSR. There's no bullets. There's a brownish stain. We'll send it to, I got very thorough investigation, we'll send it to a forensic biologist. Is this blood? It's not. Did the state have any other suspects? Was there anybody that they thought might be involved? They followed up the lead. It's hard for me to say. I mean, frankly, they know more than I do. Everything wasn't turned over. One suspect wasn't turned over after the jury was already selected, which I think is rather offensive. Before you wrap up your first argument here, I think we do want to hear your position regarding some of the physical evidence, particularly the keys. Sure. A significant issue with the keys is the timeline. And the state references, as Your Honor pointed out, Detective Carr, who inventoried the keys. Detective Carr was not, he was on furlough on October 24th. He has no personal testifying, no personal knowledge of where these keys came from. He comes back to the area, and they have a box, a vault, a drawer, whatever, everything's thrown in there, and he gets the job of having to fill out the inventory sheet. So he does. On November 22nd, an inventory is on there, three key rings. Now you ask, how do you know this? Do you have personal knowledge? No. Did somebody tell you something else? No, no, I don't know. I don't know at all. There's simply no chain of custody from the time, from the arrest, from defendant's pocket, to when it was inventoried at that time. So it comes in after that, that it was inventoried, it was in his pocket, but it's just simply not supported by the actual evidence, certainly not the evidence that the state references in its brief. The General Motors key that they found was the round one, so that fit the door, but that could have fit the door of, they never had a General Motors expert testify how many doors that might have fit. No. They did the defense. Right. And I kind of get into that in my reply brief. It's got a round key and a square key, you know. Well, they didn't have the square key. Oh, they did. But it didn't fit anything. That's what's so odd about the testimony is that they're trying to match it up to the SUV, but they say the square key doesn't do anything. The round key fits in the door, fits in the ignition, and the car didn't turn over. Like, I had a General Motors car years ago. It was one of the many discontinued General Motors lines that they don't make anymore. The square key and the round key. Round key was the door key. Square key was the ignition key. If that matched, the round key opens the door, the square key turns over the engine. Now, they say, you know, three years later, you can't start the engine. You could jump the engine and start the engine. But again, aside from that, why is this three years later? If you found this in his pocket on the 24th, you're testing it out three days later. They found other keys. They found keys in the lot near the gun. Tested those immediately. They didn't fit at all. So, I would say the testimony about the keys is not particularly incriminating. Speaking of keys, I would make one other point about that. Again, the theory is you walk right in the front door. Julia testified that when she left for the day with him outside, she locked the door. How did he get in? They changed the locks. They just had a break in. They barred the back door. They changed the locks on the front door. The residents of the house, again, according to all the evidence, don't like him. They're not going to just let him in. Jason's asleep in his bed. There's no explanation for how he got into the house. Other people have keys. Other people, as far as the people were friendly, they wouldn't let them in, but they wouldn't let William in. And there was no evidence of forced entry, although there was a bullet hole in the door. It didn't do anything to the lock. There was a bullet hole. It didn't affect the lock. The police officers on the scene testified no evidence of forced entry. That would not have gotten him in the door. It simply doesn't add up. But somebody got in. Somebody got in, but it wasn't William. I have one other question. In your brief, you take issue with the state's statement, quote, the fact that there is no DNA on this gun and no fingerprints on this gun is circumstantial evidence of guilt. Explain why that bothers you so much. This is a huge problem, as Justice Hager pointed out. Tons of DNA, tons of fingerprints, and none of it links into the case. So the state's in a bind, and they tell the jury, this is guilt. This is negative evidence, negative evidence of GSR, negative evidence of DNA and fingerprints. This is evidence of guilt. That's the opposite of what the experts testify to. That's the opposite of common sense. And I cite the Linscott case for the proposition. In that case, they told the jury, these hairs match. And the court, the appellate court, went back and looked at the records, and found what the evidence was. You're lying to the jury. You're misrepresenting it. And in a close case like this one where they're out for three days, a 9-3 split on the third day, any little thing could push them over the edge, whether it's misrepresenting the physical evidence, Jennifer Hudson's testimony about not liking him is completely irrelevant. There's no explanation for how that got in or why it was admissible. Any one of these other errors is sufficient to learn in your trial. Thank you. Thank you. Good morning, Your Honors, and may it please the Court. Everything in defendant's brief and everything said today was said to the jury. We are no longer in front of a jury. We're here in the appellate court. And there are standards of view in the appellate court, as Justice Lavin mentioned earlier. And that's whether any trial or fact taking the evidence in the light most favorable to the prosecution could find the defendant guilty under these facts. And under that standard, this evidence is absolutely overwhelming. No physical evidence, right? Yes or no? That's incorrect. Okay. What physical evidence was there? Well, the gun the defendant was seen in possession of, certainly at the card game three nights before the murder, the defendant says he has a gun at the day of the murder when he goes to the gas station. The defendant is seen with that gun. He had a gun. Had a gun. He said he had a gun. Had a gun, yes. So how does that – that's not physical evidence. It's a gun. Well, that gun – first of all, let's back up. The gun itself was identified as being Jason's gun. The person who gave Jason the gun testified that that's Jason's gun. Numerous other people testified that that was Jason's gun. Defendant was seen in possession of that gun numerous times. Defendant admitted stealing that gun and then giving it back, but then the gun disappears again after he stays over on that July 31st into August 1st night. So that is the gun that kills Darnell Donerson and Jason Hudson, and defendant is tied to that gun. So there's physical evidence. Now, these are shootings. These are shootings at more than close-range firing. Nobody was shot at close range, so within 18 to 24 inches. As with most shootings, there is no DNA evidence. This isn't a rape. This isn't a stabbing. This isn't a fight. DNA evidence is rarely found in shootings at a distance. What about in cars? What about – we've got fingerprints. We've got fingerprints. We have all sorts of residue and everything else, and nothing ties it to – That car was a mess. That car had – and the defense talks about the fact there was days and days of negative evidence, and the reason there were days and days of negative evidence is to address exactly this point and the claim that this was a robbery. That car had cigarette butts. It had – So what? That's irrelevant. The fact is we don't care what the condition of the car is. What we want to know is, is there anything in that car that ties it to FALFOR, right? And there is nothing – Well – Counsel has just told us there was nothing that ties that car to FALFOR, yes or no. Well, physical evidence, no. There was something that tied that, and that was William Graham. But he looks through from the second floor. He can see through the roof of the car. But he sees him get out of the car. He doesn't even know the guy. He knows him enough to recognize him. He knows enough to know what kind of car he drives. He can describe that car, and he later identifies that car. He's seen the man before. This isn't the first time he's seen the guy. He describes him as wearing a light blue, which is similar to a white hoodie on a gray day, the same thing that Shanta says he's wearing when he comes in that door at noon. He describes him as carrying a bottle of alcohol, which is what Shanta says he was carrying when he comes in the bottle at noon. So he's wearing the same clothes. And, again, taken in the light most favorable of prosecution, the jury knew where his vantage point was. The jury knew how well he knew him. The jury knew all those things, and yet, taken in the light most favorable of prosecution, I think you have to say that William Graham saw what he said he saw. And, therefore, the defendant was tied to that car, which was the car that the victim, Julian King, was found in. There's a whole bunch of irrelevant evidence in that car. There's pop bottles and, you know, Pepsi cans and paper cups. So there's something in the car. Usually it's outside the car, the evidence that's Graham looking through the second floor and seeing all this at the right moment. And there's no reason that there's nothing that excludes the defendant from the car either. This isn't like Rivera, where you have seen in a young girl that excludes Rivera as the defendant. That's an exclusion. There's no physical evidence here that excludes the defendant from doing this crime. Well, it sure raises a lot of reasonable doubt. If you have very little evidence and everything is circumstantial to the hilt and it's all negative, negative, negative built on circumstantial and expert testimony and was this the only suspect? I don't know if it was the only suspect or not. First of all, he's the first logical suspect because, you know, as we point out, he has a motive. And, again, he said again and again, I don't like them. They don't like me. I don't like the family. I'm going to kill the family. He not only had a motive, he said he was going to do it. He said numerous times that he was going to do it. He had access to the gun and people saw him with the gun numerous times in close proximity to the time this happened. The gun, as you will remember, is found in a straight line basically between where the SUV is found and where he would have gone back to 1925 South Baldwin. And he told Kathy that he was out doing something with his car, right? Exactly. And his car was actually back over on the south side. His car was over near Robeson High School at the time. And this whole thing about whether or not, you know, his car was broken down, he certainly was able to take a long trip to the far south side, come back with the car. He was driving the car that even after he leaves Duke's house, he's in the car. Nobody says, you know, the woman he was with the night before doesn't say there's anything wrong with the car. Duke doesn't say there's anything wrong with the car. And it's very clear that he lies about that car. When you say that, what are you referring to? Well, he says, I parked the car when he's arrested. He says, I parked the car at Robeson High School at 830 in the morning. Then I took the CTA and went home. Well, he didn't park the car at 830. We know that. The car was parked at 1230. And it wasn't parked by the defendant. It was parked by somebody else. The defendant was in the white car driving Julian to the place where he dumped the car and left the body and then walked away and dumped the gun. There's no reason in the world that his DNA would necessarily, or fingerprints would necessarily be in the white car. And that doesn't mean that he didn't do this crime. I mean, you know, he's the last person driving that car with Julian on that day. And then the car is found. I mean, obviously, in context of all the other evidence, he's the killer. Now, this thing about the medical examiner is interesting, because if you actually look at what the medical examiner says, one of the things that she says, she agreed that she was unable to forensically determine the date and hour when the victim died. Now, this is something that you see on TV shows all the time. When did the victim die? You know, place an exact time of death. And as your honors know from the many cases you've seen, that isn't really how it works. You know, they look at rigor mortis and state of decomposition and things like that to give an estimate of times. She stated that the lack of rigor mortis and decomposition were consistent with a person who had been dead for more than 36 and closer to 72 hours. She didn't say 72 hours, boom, it's over, you know, game's over. Julia's body was found on the morning of the 27th and taken to the refrigerated morgue. The purpose of refrigerating bodies is to stop decomposition. That's why you refrigerate bodies. So that period is still within the 72-hour period when he gets to the morgue from the 24th. So it does not exclude it. And as I said, she could not put an exact time of death, and this 72-hour thing is not a hard and fast boom. Something happens at 72 hours, and after that, you know, we're passed. In terms of the DNA on the gun, this was a low level of DNA, and it wasn't likely you'd get 13 loci or anything like that. Jason Hudson's was not excluded, which makes sense. It was his gun. So it would still have some DNA. And then there was an additional mixture profile that was never identified. In fact, there wasn't even enough to determine the gender on that one. So we don't know who that was. But that certainly, this isn't something, the lack of DNA does not exclude the defendant. None of this physical evidence excludes the defendant. This is not like Rivera where there was an exclusion or a potential exclusion. So the fact that there's no DNA or fingerprints of the defendant in the car doesn't mean he was never in the car. I would agree with it. The defense states, the state's two fingerprint experts testified that they examined numerous items, the GMC set, dozens of items found inside the SUV. None of the items matched William, and 11 latent prints suitable for comparison never were identified. That's true. That's true. Okay. The state's three DNA experts testified that they analyzed scores of items, including the murder weapon, using both standard DNA analysis and YSDR method. None of them matched William. True. True. Didn't exclude. It didn't exclude him. Again, it's all negative evidence. Well, you can't. I mean, if there's no evidence there, you can't exclude it. You can't. And again, the stuff that was tested in the car had no relation. I mean, what does this Pepsi can have to do or Pepsi bottle have to do with the murder? Okay. Well, how about the state's two forensic biology experts testified that they examined scores of items, which is quite a few, connected to William, including his tan leather jacket, his boots, and the entire interior of the green Chrysler. Every one of these items tested negative for blood. Why would a person have blood on them if they shoot somebody at a distance? This isn't the movies. The blood doesn't shoot across the room. There's no reason in the world why he would have blood. He didn't stab anybody. He didn't rape anybody. He didn't beat anybody up. He shot them at a distance. There's no reason. What distance was testified to? Yes. What was the distance? It was more than 18 inches. Well, that's pretty close. 18 inches. Well, there's no evidence. Blood usually will spread 18 inches. I don't think there's any evidence to that, Your Honor. I think that's certain. With a shotgun, it doesn't spread 18 inches? Well, there was no shotgun here. This was a pistol. And a person shot in the back through clothing at a distance of at least. When a medical examiner testifies that there's no evidence that the person was shot within close range firing range, there's no evidence they were shot closer than 18 to 24 inches. That doesn't mean the defendant was within 18 to 24 inches. There's just no evidence that he was closer than that. So he could have been, and most likely was, farther away from these people. There's no contact wounds or anything like that. There's no reason. The other thing is the things that were tested are things that he was no longer wearing when he was arrested and the things that the police recovered. This white hoodie and the black pants and the shoes that he was wearing, they disappear. They're gone. The tan jacket? He's not wearing the tan jacket when he goes into the CITCO. He's not wearing the tan jacket when he goes to Duke's house. He's not wearing the tan jacket when he goes back home at noon. There's no blood on the tan jacket. So what? Well, you mentioned that there's no blood on it. So what? Well, the point is he's wearing the hoodie, and if he's not wearing the tan jacket, he is wearing something else. And the one thing else that he's wearing is a white hooded sweatshirt and different pants and different shoes. There's no blood on the tan jacket. I mean, I don't understand why. I'm missing what your point is, John. I'm missing what your point is, actually. Well, my point is that he wasn't wearing the things that you would expect. If there was going to be blood on something, it would have been on the things that he was wearing when he committed the murder. Those things have disappeared. Those things were never tested because he got rid of them. You don't have any evidence to say that. Well, I think we do, Your Honor. He goes back home. He's wearing a certain set of things. He leaves the house with a different set of boots, certainly. He's seen by Shonta. And then he comes back, and he's wearing something later in the day that he wasn't wearing. And the things that he was wearing, that several people talked about him wearing, the white hoodie, et cetera, can't be found. And he tells the police, I've been wearing these clothes all day. When he takes them off and gives them to me. And that's a remarkable piece of evidence, Your Honor. Because the first thing they do, they bring him to the room, they advise him of his rights, and say, we'd like your clothes. Well, a normal person, innocent of a crime, would say, why? But this guy says, I've been wearing these all day. That is such an exceedingly bizarre statement for somebody who's innocent of a crime to say. Only a person who knows that they were wearing other clothes, and they ditched them because they had something on them, or may have had something on them, and that something was most likely gunshot residue. Only a person who knows that would make that statement to the police in that context. That's speculation to the highest degree. Oh, I don't think so, Your Honor. What else would a person be saying?  Well, we at least know that it was a lie, because he was wearing different clothes. It certainly was a lie. We know it was a lie. Whether or not, you know, the jury gets to decide whether to accept this inference or another inference. And both sides were arguing inferences like crazy, because it wasn't a perfect CSI case, was it? No, it's a circumstantial case, but not completely circumstantial, Your Honor. We do have some direct evidence, and the direct evidence is his statement to Shanta. And, again, getting into that, again, taken in the light and most favorable of prosecution, we have to believe that that's what she was telling the truth. Because the jury heard all the other explanations for why she might not be telling the truth, and clearly they didn't believe those. And if you're going to take it in the light and most favorable of prosecution, that means... Did the police take Kathy to a police station? Yes, she went to a police station. She has her kids there. She has her kids at home. They just take her. They put her in a cell or wherever they put her. They don't record anything. She's worried about her kids. But what counsel had argued about, I mean, she kept changing the story to make it closer to what they were looking for, the police were looking for. I mean, we have a changing story. We have a woman who's in a situation she's never been in before. It seems like the police may have put too much pressure on her. Well, how could she change her story? Well, because she was telling a lie to begin with, and she was telling the lie that the defendant told her to say. You know, the defendant told her, and he also told Brittany, you know, you had to cover for me, basically. I was on the west side to Brittany and then to Shonda. You know, I've been here since 10 o'clock in the morning. 10 o'clock. Yeah, 10 o'clock. And, you know, the exact time of death in this case was sometime, you know, between 9 and 10. One girl talks about a 9 o'clock set of gunshots. Another girl talks about a 9.30 set of gunshots. And is it ridiculous the defendant would – I'm sorry. I'm interested in the cartridge cases and the fired bullets. Yes. There was a fired cartridge case under the car outside of Julia's house. The car that was remaining out there, yeah. There's a sort of a broken down car. Some car. Yeah. And there was a fired shell case, which is the same as a fired cartridge. Yes. On the front porch. And there was a bullet hole in the front door, but there was no bullet found inside the front door. Is it a correct statement? Right. The bullet hole could have been made any time. Unless somebody that morning fired a bullet into the front door, which incidentally did not open the door, and picked up the bullet, the fired bullet, the bullet hole in the door could have been made any time. It had to be made sometime that day because people testified that the bullet hole wasn't there. Well, Julia testified that the bullet hole wasn't there when she left in the morning. Where's the bullet? Then there's a cartridge case in the playroom. But if a bullet had been fired in the playroom, say, hypothetically, that the child was in there, there would have been a bullet and blood, or a bullet and a dead body, or a wounded body and blood. But there was none of that. There's just an empty fired cartridge case. Yes. It was not, was that, and that may have been actually a cartridge case with the ammunition still in it. But that was in the playroom, is that right? And they tested that and that was from Jason's gun, but there's no indication when that got there or how that got there. No. But presumably during the course of this shooting in the house. Why presumably? Jason had that gun. We don't know. Well, Jason's gun was missing as of August 1st. Well, before August 1st. We don't know when that cartridge case got there. We have no clue. The fired bullet in Jason's bed, I think that was a result of shooting Jason in the bed. He shot through and through a wound, yes, in the bed. And the fired cartridge case under the bed would be explained by the fired bullet in Jason's bed. Certainly could be. So there are fired shot casings and unfired cartridge cases that can't really be explained in a bullet hole that can't be explained. Is that a correct statement? Well, it can be explained in the context that multiple shots were fired in the house. Specifically how the bullet hole came to be in the door, no. I mean, we don't have an exact explanation for the bullet hole in the door. I don't know that it's crucial to the case, but we don't know. Why don't you compare this case to Rivera for us? Well, again, one of the issues in Rivera was corpus delicti. And the traditional requirement that when a statement is, you know, a custodial statement is made that there has to be some corroboration for the statement. And then they look to see if there's any evidence at, you know, El Unde, the statement. And in that case, they found that there wasn't. And one of the keys in that case, of course, was the semen in the little girl that did not belong to, that was not deposited by the defendant. And that was really the key to the case. And the other statements that are made by the jailhouse snitches in that case, and again, we don't have any jailhouse snitches in this case. We don't have anybody that was given a deal or anybody was expecting a deal or anything like that. But those cases were very, the statements that they made were very general, kind of like I did it type statements. No facts, no corroboration, no details that you would need for a corpus delicti situation. So we don't really have a corpus delicti situation here. The defendant doesn't make any inculpatory statements. He makes some false exculpatory statements that certainly bear on his guilt. But he does not make an inculpatory statement that, you know, the defense was claiming was coerced. So the defendant certainly had the motive for this case. He had the motive to do it. Before the crime, he said he was going to do it. He said to numerous people he was going to do it. He was at the murder scene the very morning of the murders. He was still in that area, in that general area, when the murders were committed. He was tied directly to the murder weapon, and he was seen driving Jason's SUV after the murders and was arrested with the keys to the car. Again, the whole question of the chain, Rodriguez said he recovered the keys from the defendant. He identified the keys in court, and then those keys were used to open the door. This whole thing about a round key and a square key, that wasn't inevitable. There was evidence that a round key opened the door, but the question of whether or not a GM square key would be required to open that, that was not part of the evidence in this trial. That was something added in the reply brief. And the state never produced any evidence that in that year, in that model, GM round keys did or did not open one car, 100 cars, 1,000 cars, a million cars? We just don't know. Well, we don't know, but presumably keys are made for the purpose of opening your car and keeping other people from opening your car. This key did fit that car, so certainly that was probative evidence. The jury was aware of that, and the fact that the defendant was arrested with that key, and not with the keys to the green car. He's arrested with the keys to the white car. That is significant, Your Honor. Well, he said that he told a friend of his that Brittany had the keys to his car. Yes. So it's not surprising he didn't have the keys to his own car. No, and that goes to the fact that the defendant wasn't the one who parked the car at 1230 at Robeson High School either. That's exactly what that proves, Your Honor. I'm still worried about the SUV keys. Okay. How did he drive it if the key didn't start the car? Now, the police are saying, oh, it's three years later, which I still don't understand why they waited three years to test these keys. I would have thought that would have been right away, and the battery was dead. Well, what does it take to jump a car and try it? Well, I don't know that they didn't do that, but the bottom line was the officer said that the key fit the ignition. Have you ever owned a GM car? I mean, I think the defense counsel mentioned that you've owned GM cars. I think it would be pretty easy to figure out whether a round key ever could start an ignition in a GM car. I think that would not be a hard question to answer someplace, and it was never answered. Certainly, but we have to go on the record that's before us, and the record before us states that Rodriguez found the key and the key fit the door, and if he has the key that fits the door, I don't even know. Maybe the other key could have fit the door, the ignition, the square key that was found. We don't know any of those things. It wasn't done. What we do know is that key fit the car, and the defendant had that key. So that's certainly taken in the light most favorable to the prosecution, Your Honor. Well, taken in the light most favorable to the prosecution, I'd say there's a hole in that chain right there. I would say that's the opposite of taking it in the light most favorable to the prosecution, Your Honor. Again, where there's two possibilities and one possibility is not impossible or so improbable as to be ridiculous, then this court is bound to take that as evidence that it actually happened. Just like when Shanta Cathey says the defendant confessed to me, the jury was fully aware of the circumstances that she made that statement, and this court is bound to accept that statement taken in the light most favorable to the prosecution. Your colleagues in the reply brief, I think it was, argue that all of the evidence as to what he was up to during that day and his whereabouts or no information about his whereabouts and asking for help, asking for somebody to meet him somewhere was consistent with an innocent man who was just trying to find somebody to help him fix his car. What would you say about what he was up to during those hours where he's talking to people in the afternoon looking for help? I would say he was up to trying to get somebody to move his car from farther away from the area that it was at, which was not, you know, Rebson High School is a little removed from the scene, but it's not too far away. It's not too far away. And so that's what he was trying to do. He was trying to get somebody to move his car and, you know, said, well, I'll meet you there. Well, I don't want to meet you there. And, you know, he's got this explanation of, you know, you can meet me over here. And then when Quincy asks him, well, how'd you get there so fast? You know, you were on the west side. Now you're over there. How'd that happen? And the defendant says, oh, don't question me like a police officer and gets all upset. Again, a statement that, you know, of a guilty conscience. And then when Quincy asks him further, he starts asking, you know, do you know anything about the murders? And, you know, it's bigger than me. Again, it's not a normal innocent person would say I didn't do this. I had nothing to do with it. I wouldn't say some cryptic statement about it's bigger than me. Yeah. And in the same conversation, he said he got into it with Jason. Yes, he did. Yes, he did. Did he say when? He didn't. He didn't. But in the context of that conversation, when he's asking why would Julia be saying that I had something to do with the murders, his response is I got into it with Jason. The normal logical putting that into context is that that was the response, that it was something recent. That's the way, again, a person would normally look at it. And, again, taken in the light most fair rule of prosecution, I think that's the way you have to look at it. Did they refine the suitcase with the drugs that was by the banister? There was a statement by one person that Jason would stash his drugs near the banister, that there were no drugs near the banister. You know, the other people that testified about Jason being a drug dealer, and he was, he dealt drugs. He didn't deal weight as the defense claimed, but he did deal drugs. The other people all testified, you know, I didn't see the stuff in the house. Julia said I never saw the stuff. Well, they said he sold it from the car, but that's not inconsistent with taking it in the house at night and putting it in a suitcase near the banister either. A suitcase would be portable. He could keep it in his car, do the drugs out of the car, and stash it in the house at night. Well, you know, the question came up earlier about, you know, why would the Hudson family have allowed William, the defendant, into the house? You know, it cuts both ways because, you know, why did they let the rival drug dealers that supposedly came into the house to do the murder in? You know, there's no forced entry either way. And there were other fungible, easily moved, valuable items in the house. It was Darnall's purse, and there was money in the purse, and there were checks, and there were small items that could have been taken if this was just a robbery. What if it wasn't just any robbery? What if it was a drug robbery from rival drug dealers who just wanted the drugs? Well, that's what they claimed. That's what the jury- A suitcase full of dime bags. How much would that be worth if we had any idea at all? Even a small suitcase. I don't know. Well, I never heard that there was a suitcase full of dime bags. There was a stash kept, you know, by the banister. And other people said that the stuff was not kept in the house, and there was large amounts of stuff. And, again, this wasn't a palatial lifestyle. No, they said he stole it out of the house. They didn't say that they saw anything in the house of his either. And, again, we have to take that. The fact is that the rival drug dealer claim, again, cuts both ways. The defendant himself was a rival drug dealer. Counsel today said there's no evidence that the defendant was selling weight. Well, you have to remember the context of this case. The only reason we were able to get into the fact the defendant was a drug dealer is because they were talking about Jason being a drug dealer, but it was limited evidence. The judge curtailed the amount of evidence that we were able to put in about the defendant being a drug dealer because that would have been proof of other crimes and an ancillary issue. So it's kind of disingenuous to say there's no evidence the defendant was selling weight. Well, there is evidence in this record, but part of the reason there isn't evidence in the record is because they kept it out. One thing we know, the only drug deal that happened that day was one that the defendant was involved with. Yes, when they go over to the gas station. He's up all night. He's over at somebody else's house and is selling crack at 7 o'clock in the morning, right? Exactly. So between the time the defendant was in the Hudson house in the morning and the time he was arrested, he certainly had time to change and ditch his clothes, which we've talked about. He certainly told his girlfriend that he did it, and he tried to get her and another person to lie about where he'd been during the day. He made statements to friends and the police, numerous statements that were lies about where he was. Little things about what he was doing to his parole officer, he said he was one place, to another person he said he was another place. He can't tell the truth to anybody that day. And, of course, when he gets to the police station, he makes that bizarre statement about, I've been wearing these clothes all day and things like that. So in the face of all this evidence, the defense basically put on no case. I mean, they put on two slight impeachment people, but their case was solely piggybacking off the state's case. And that's the reason that there were these so-called days and days of negative evidence, because the defense all along was claiming this was a robbery. All along they were claiming it was significant that there was other people's DNA and fingerprints in that car. And the state had to show that they investigated all those things, and they did. I mean, it was exhaustive. The amount of phone records that they went through, the number of DNA and fingerprint tests that they took, it was exhaustive. But it was to combat this defense notion that there had been a robbery of a drug dealer or that somehow it was significant that there was other people's DNA and fingerprints in the car. Well, sometimes that is significant. It could be if those items were tied specifically to the murder, if those items had something. You know, somebody said, I saw a guy in the car drinking a Pepsi, and then there were gunshots. Well, the fact that there's DNA or fingerprints on that Pepsi bottle might be important. But in the context of this case where there's all sorts of junk in the car, and we put on a dozen people who said they were in the car, and each of those dozen people mentioned another dozen people that was in the car. And this car, everybody in the neighborhood was in this car. People that people knew and could identify, and we put a number of those people in, and the number of those people's DNA came back as being in the car, and a whole bunch of other people. There's one guy whose DNA you want to find in the car, you don't find in the car. That happens, Your Honor. Apparently you have dozens of other people's DNA, but you don't have... Well, it makes sense. None of those other people had an incentive to not have their DNA in the car either, Your Honor. And the defendant has an incentive to not have his DNA or fingerprints. Well, if they're doing drug deals in the car, then there's... I don't think so, Your Honor. People don't hide the fact that they're doing drug deals. They don't go to the extent of hiding their DNA. A murder is a quantitatively and qualitatively different set of circumstances, and people would take much more care. The defendant wasn't hiding the fact that he was a drug dealer. Jason wasn't hiding the fact that he was a drug dealer. That's not what people are hiding. They do hide the fact that they're murderers, though. That they'll take steps to hide, and here the defendant did take those steps. I have a question about Jennifer. She testified that Jason had no enemies, which we've all agreed he's been twice shot, so somebody is like him. How is that relevant? How is that life and death? Well, she wasn't called as a life and death witness, Your Honor. She was called because she had numerous other things to say as well, and numerous witnesses were asked if he had any enemies, and that related to the enemies that she knew about. Obviously, she couldn't testify. Well, she hadn't lived in the household for six years. No, she hadn't, but she was unaware of it. You know, this is a common question that's asked of lots of the witnesses. Did he have any enemies? Some people said he had enemies. Some people said he didn't have enemies. But she testified to several other things other than she did testify to life and death, but she also testified to the fact of making texts and phone calls to her mother, which she normally did at that time, and that those were not returned and that concerned her, and she made repeated efforts. And that was relevant because it placed the time of the murders into context, putting it between the 9 and 10 o'clock time she was in Florida and, you know, discounting an hour and stuff like that. She also testified that she gave checks to the family, and that those checks were, you know, and we know from other witnesses, those checks were still found in the house, again, to rebut the notion that this was going to be a robbery. She testified that she gave Jason the white SUV, and she testified that she and the family did not like the defendant. That went directly to the motive. The motive in this crime was because the defendant didn't like the family, and he knew the family didn't like him, and he resented that. If you look with Robin Myers, he went, this person who he barely knew, he went at length into the fact that they don't like me, they think they're better than me, I don't like them, I'm going to kill them, he has a gun when he's saying this, which, you know, several times he's got a gun when he's saying, I don't like these people and I'm going to kill them. So, I mean, these were all relevant things for her to be talking about. It certainly went to the motive in the case. And in terms of whether or not, I mean, the defense raises that Jennifer's celebrity, therefore this created a problem in that the jury would take her notion that she didn't like the defendant to heart and, you know, hold it against her. Now, first of all, the fact that she was testifying against, in a case of a person charged with murdering her family, it could come as no shock to the jury that she wouldn't like this person. And the fact that, you know, that she didn't like him, the family didn't like him, also goes to her bias. The defendant, before the trial, said she's nothing more than a biased witness. She shouldn't be called. Well, and the trial court did something with the jury during voir dire to try to make sure that her celebrity would not be an issue at the trial. There was a jury questionnaire that was filled out about these things. The parties were free to ask questions about this thing. You know, this is a case that had some press, and so the court took several steps to alleviate that or mitigate that possibility. In any event, Your Honors, for the reasons we've stated today and the reasons we've stated in our brief, we'd ask that you affirm the defendant's convictions and sentences. Thank you. Counsel? If you may, please, the Court, I'd just like to correct the record on a few very specific things that Mr. Fisher just said. He talks about the DNA in the car, Pepsi bottles, there's lots of junk in the car. There's an unidentified male DNA profile on the murder weapon. Everything you said about Pepsi bottles and everything else does not discount for the fact that, directly related to the offense, the murder weapon has an unidentified male DNA profile on it. How, Williams? He talked about the Citgo, what Williams was wearing when he went to Citgo. Now, I can understand the source of the confusion. There's two tapes. The tape where he went to Citgo after he talked to Julia, when he met Julia in a tan jacket, shows, if you watch that videotape, he's wearing the tan jacket. And, again, the state's theory is that he met Julia, maybe he went to Citgo, but he goes in the house, he shoots three people. There's an issue of range. Two of the people were shot at a downward angle in the head. There's a limit to how far away you can get. Eighteen inches, sure, but, I mean, it's not floating on the ceiling. Inside the backseat of an SUV, how high could you really get to shoot someone at a downward angle in an SUV? And, again, they expected to find blood evidence, DNA evidence. That's why they were so thorough. They saw Brown standing on the jacket. They thought, this is it, this is the blood. It wasn't blood. So that was a mistake. If they weren't that thorough, I'm guessing the jury would have heard about it. Right. They were extremely thorough. I don't disagree with that at all. Whether he had car trouble. It's clear from numerous independent witnesses that he had car trouble from the previous day. Diana Grant, the woman he was with the previous day, testified that he was having car trouble. He was supposed to drive back, meet with Julia. Right. She had texted him, said, don't go in. Come meet me. The reason he's stuck in the southeast side, according to Diana Grant, is because he had car trouble. 730 in the morning, he does a drug deal. The guy he did the drug deal with, he met him at 730 in the morning, and the first thing out of his mouth is, I'm having trouble with my power steering. Would you help me fix my car? That's Tyrone Dunbar. 10 o'clock, about 10 o'clock. This is after the shootings. He goes to Duke's apartment, just like he told Julia he was going to do, and he says to Duke, could you help me fix my car? I helped you the night before. Could you help me now? That's not what Duke said. No, but there's another witness to the conversation. There's a guy on a bike. Duke said he doesn't really remember. He said, could you bust a move with me or something? He said, I just need to go somewhere or do something. He wasn't sure what he said. Michael Hurst, who was also present, said, yeah, he drove up in his green Chrysler, asked Duke to help him fix his car, drove away in the green Chrysler. If the defendant needs to get his car to the west side to explain how he got there without tying him to Jason's vehicle, he needs help to get that car over to the west side. And the evidence is consistent with a man who knows he's got to get that car away from the scene of the murder, and he's trying to get help. Meet Brittany over there. She's got the keys. Go on over there. Get my car out to the west side. Right now. Meet me right now. Not in an hour. Right now. Meet her right now. This is not an innocent, it's not entirely consistent, I should say, with an innocent man who was just trying to find help fixing the power steering in his car. Brittany Simmons testified she did not say anything that you just said, that he asked her to move the car to the west side. Duke's house is probably further from the Hudson home than Robeson High School is. Mike Morris testified he drove the green Chrysler to Duke's house. He could have left it there if that's what he wanted to do. Any notion about he wanted to move it to the west side, again respectfully, that's not in the record. He wanted everybody to meet him in Englewood. Meet Brittany in Englewood. What is in the record is his claim that he parked the car at 830 and then got on the CTA using his CTA pass. And we know that both of those statements are lies. That's true. We know that's not what happened. But we know he did go to the west side, and we know that he went there at about 1 o'clock. And that's not just taking it in the light most favorable to the state. It's just simply not true. So this is an innocent man, according to the defense, who is giving information to the police about an investigation in which three members of his wife's family are dead, two of which they know at that point in time. And he's giving them bad information. He's lying to them. And you say that we should take that as proof of an innocent man. He's giving them false exculpatory information. That much is true. He already knows. He's getting phone calls. You're on WGN News. The police are looking for you. At the time he gives a statement, you're on a reference. He's in an interrogation room. They took his clothes. He's standing there in a paper gown. He knows he's been implicated, and he's trying to clear himself. That's true. That doesn't mean that he personally shot and killed three people before that happened. What about the motive? Mr. Fish has talked a lot about the motive and that he wanted to kill his family. He said, I'm going to kill him. What's your response to that? The motive was that he didn't like the family. A lot of people don't like their in-laws. He's their son-in-law. That's true. The statement he's referencing to other people is not saying, I'm going to kill them. He's saying, I got into it with Jason Hudson. I want to fight Jason Hudson. The statement's about killing her in the form of, if Julia leaves me, I'm going to kill her family and I'm going to kill her. Look, he told a 13-year-old kid at the park that she's screwing around with somebody. I mean, come on. This guy was obsessed. With his wife? With his estranged wife. They weren't estranged. Well, maybe she was obsessed with him, too. Yes, I agree. You could fill volumes with the dynamics of a relationship like that. But this is a man who repeatedly, to various people, threatened to do exactly what was done. Kill your family first. This is exactly what he presaged these events with, out of his own mouth. And the events out of his own mouth were, if you leave me, that's what I'll do. Unless we get back together. I mean, the timing of this is extremely bizarre. As you say, they're jealous with each other. They have boyfriends and girlfriends on the side. And in particular, the evidence is about her boyfriend, Richard. She essentially broke it off with Richard. The only evidence about Richard is a week before any of this happened. Which is about the same time she was meeting William at a motel. No, there's a little more evidence about Richard. Because the defendant himself said that he was over there that morning. He thought he was going to find her with her boyfriend. He said that to the police. And he didn't. And she called him the night before and said, I'm not with him and I want you to come over. He thought, you're right, he thought that she was with Richard. It was her birthday. She's going to celebrate with Richard. They're going to go back to her place. And that was upsetting to him. The bottom line is this. As a court of review, we have to think that the state's case is so improbable, just so unsatisfactory as to be riddled with reasonable doubt in order to undo what this jury has done. And the story that sounds improbable and riddled with doubt is the defense in this case. The specific question you need to look at is did they prove beyond a reasonable doubt that he shot and killed three people? I understand your issues with his false inculpatory statements and the threats. That's all very valid. Maybe you feel as involved in this somewhat. You know, counsel mentioned his statement to Quincy Brown after he knows the police are looking for him. He's desperately saying, go to meet me in Englewood. Meet Brittany at 71st and Vincennes. And he says, this is bigger than me. Now, you could take that two ways. You could say he had nothing to do with it. It's bigger than him. This is some high-level gangster type whatever it is. Or, and again, in the view most capable to the state, you could say maybe he's involved somehow in some kind of bigger thing. That's not enough. The state charged him in a way to say that he shot three people. We know for a fact he didn't shoot one of them. In light of that, it's possible he didn't shoot the other two. And again, the standard here, you have to look at the record as a whole and say did they prove that beyond a reasonable doubt. With regards to not shooting the one, the argument of Mr. Fisher was that the body was placed in a freezer. And so if you start at that time, you get it within close to the 72 hours. Well, it's refrigerated, not frozen. There's nothing in the record like that. I've been to the medical examiner's office, right? It's cooled. The body is supposed to stay in the condition. I mean, it's not supposed to deteriorate any further. There's no basis on that in the record. That's not what the medical examiner testified to. Certainly things continue to deteriorate. But more to the point, her opinion was based on the assumption that the body was left in a car that was unheated in late October, and she already figured into that that it wasn't heated. In fact, she said when she's talking about there's a lot in the record. She's explaining the decomposition, rigor mortis, the blood flow on the body. She specifically said what if the car was hot? And she specifically assumes the car was cold. It was recovered from the car on the 27th. She knows that it was brought to the morgue, right? She's taking all that into consideration when she makes her opinion, 72 to 36 hours. Mr. Fisher says she can't put an exact time in doubt. That's true. That's why she gave a range. She said closer to probably less than 72 hours. Taken in a light most favorable to the state, you say that that means that there's not enough evidence and the child's killing, right? Yes. I would say it's math. It's like what I said before about the sun rising in the west. If it's closer to 72 or less than 72, and she's hedging. She's giving a range, but the range is in the opposite direction. The range is in the direction of the time that he's in custody, 36 to closer to 72, quote, less than 72. That's not even close. It's up by at least 12 hours because he was in custody at 6.05 on October 24th. And for that reason alone, this court has to conclude that the state did not prove beyond a reasonable doubt that he personally shot and killed Julian King. And in light of that and in light of everything else that we've talked about today, you should also reverse the other two convictions for first-degree murder. And, again, if you're not inclined to do that, at the very least, what we have here is a very close case. Again, the jury's out for three days, split nine-three on the third day. Any kind of error or irrelevance of Jennifer Hudson's testimony, the misrepresentation of the GSR evidence or the DNA evidence, is enough to tip the balance in favor of the state and cause the jury to convict. If your honors have no other questions, thank you. Thank you. Thank you, everybody. This court is in recess, and I'll take it on this day.